IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Alexandra Avchukov, Quentin Chappat, Sandra Maesta Pereira, Kris Iyer, Anthony Palie, Dakota Bedell, Carl Corbo, Annabel Gould, Dolores Thompson, Bridgette Winkelmann, Billy Ting, Duoc Vo, Garry Huang, Jeffrey Wang, Joshua Chin, - *and* - Willy Ngo *on behalf of themselves and all others similarly situated,*<br><br>*Plaintiffs*<br><br><br>v.<br><br><br>Avant Gardner, LLC, AGDP Holding, Inc., EZ Festivals, LLC, Made Event, LLC, -*and*- Jurgen Bildstein<br><br>*Defendants* | Case No. 1:23-CV-8106-MMG-JW<br><br><br><br>**AMENDED CONSOLIDATED CLASS-ACTION COMPLAINT**<br><br><br><br>*JURY DEMANDED* |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 4

JURY DEMAND ................................................................................................................ 5

PARTIES ........................................................................................................................... 5

JURISDICTION & VENUE ............................................................................................... 8

FACTUAL ALLEGATIONS ............................................................................................. 8

    Part 1: Business Identities ........................................................................................... 8

    Part 2: The 2023 Festival ............................................................................................ 9

    Part 3: History of Dangerous Operations ................................................................... 16

    Part 4: Inter-Relationship Between Defendants .......................................................... 18

    Part 5: Plaintiffs' Experiences ................................................................................... 22

        Plaintiff Alexandra Avchukov ................................................................. 22

        Plaintiffs Quentin Chappat & Sandra Maesta Pereira ............................... 23

        Plaintiff Kris Iyer ..................................................................................... 25

        Plaintiff Anthony Palie ............................................................................. 26

        Plaintiffs Dakota Bedell & Bridgette Winkelmann ................................... 30

        Plaintiff Carl Corbo .................................................................................. 33

        Plaintiff Annabel Gould ............................................................................ 36

        Plaintiff Dolores Thompson ...................................................................... 38

        Plaintiff Billy Ting ................................................................................... 42

        Plaintiff Dewey Vo ................................................................................... 44

        Plaintiff Garry Huang ............................................................................... 47

        Plaintiff Jeff Wang ................................................................................... 48

        Plaintiff Josh Chin .................................................................................... 49

        Plaintiff Willy Ngo ................................................................................... 51

    Part 6: Class Allegations ............................................................................................ 53

CLAIMS FOR RELIEF ................................................................................................ 56

    Count 1 – Deceptive Acts and Practices (N.Y. GBL § 349) Against All Defendants .............. 56

    Count 2 – Breach of Contract Against All Defendants ............................................................ 58

    Count 3 – Unjust Enrichment Against All Defendants ............................................................ 59

    Count 4 – False Advertising (N.Y. GBL § 350) Against All Defendants ............................... 60

    Count 5 – Fraud Against All Defendants ................................................................................. 61

    Count 6 – Negligent Misrepresentation ................................................................................... 62

    Count 7 – Breach of Implied Covenant of Good Faith and Fair Dealing ................................ 63

    Count 8 – Promissory Estoppel ............................................................................................... 64


PRAYER FOR RELIEF ............................................................................................... 65

## INTRODUCTION

1) This lawsuit is a class-action on behalf of tens of thousands of individuals who purchased tickets to the 2023 installment of an annual music festival known as "Electric Zoo," held every Labor Day weekend on Randall's Island in New York, New York.

2) Defendant Jurgen Bildstein is the owner, via Avant Gardner, LLC,  of several nightlife ventures in New York City, including a permanent venue known as "Brooklyn Mirage" and, via subsidiaries Defendants AGDP Holdings, Inc., EZ Festivals, LLC, and Made Event, LLC, of the Electric Zoo event.

3) The 2023 Electric Zoo event was to feature, among other things: three full days of specified musical acts performing on multiple stages with world-class audio and visual installations, food vendors, general amenities (merchandise tables, portable toilets, free water refill stations, *etc*.), ferry service to the island, and a host of "VIP" amenities including preferred VIP areas, air-conditioned trailers with flush toilets, and passed hors d'oeuvres.

4) Instead, this year's festival-goers were treated to a fiasco, in which Defendants, through their joint and several conduct, drastically oversold the event, failed to obtain proper permitting and staffing to operate a safe venue, and failed to adequately construct the facilities required to operate safely, let alone provide a facsimile of the promised entertainment experience.

5) As a result, the first of the three days was cancelled completely – just hours before it was scheduled to open.  The second opened two hours late, yet still prior to completion of the construction of the venue, including the festival's main stage, and was grossly understaffed, causing hours of additional delay at the entrance for many.  And the third was an oversold and overcrowded disaster that devolved into a dangerous stampede leading to many injuries after Defendants' understaffed security attempted, but failed, to prevent thousands of waiting ticketholders, many of whom traveled great distances to attend, from entering the festival.

6)    Additionally, at all times when attendees were able to access the festival, they were treated to shoddily constructed and unsafe viewing areas, exposed cables, insufficient trash receptacles, inadequate and unsanitary bathroom facilities, missing or confusing signage, abusive security (who often solicited bribes), and exit delays that effectively confined attendees for hours.

7)    The festival's failures resulted from and were exacerbated by Defendants' consistent lies to attendees.  Defendants explicitly lied to guests when they encouraged them to arrive on time for Friday's show and then lied to them regarding the reasons behind the much-curtailed event schedule.  They then lied when they claimed the remaining days of the festival would proceed as planned.  They also lied about the amenities they said they would offer. And they lied when they advertised the event as a world-class festival, when in fact they had no intent to provide even a safe and lawful environment for the public to congregate.

8)    Defendants' above-described conduct not only constitutes a breach of contract, their reckless and/or intentional misrepresentations concerning the festival rise to the level of fraud. Plaintiffs are individuals who paid for tickets to a safe event and were instead treated to either a riot or no show at all.  They hereby sue to recover their ticket prices plus statutory and punitive damages on behalf of themselves and all others similarly situated.

## JURY DEMAND

9)    Plaintiffs demand a trial by jury on all issues so triable.

## PARTIES

10)    Plaintiff Alexandra Avchukov is an individual who is a citizen of the State of Georgia. Avchukov purchased tickets to all three days of the Electric Zoo 2023 festival.

11) Plaintiff Quentin Chappat is an individual who is a citizen of New York County, New York. Chappat purchased tickets to all three days of the Electric Zoo 2023 festival.

12) Plaintiff Sandra Maesta Pereira is an individual who is a citizen of New York County, New York. Pereira purchased tickets to all three days of the Electric Zoo 2023 festival.

13) Plaintiff Kris Iyer is an individual who is a citizen of New York County, New York. Pereira purchased tickets to Friday and Saturday of the Electric Zoo 2023 festival.

14) Plaintiff Anthony Palie is an individual who is a citizen of Massachusetts. Palie purchased tickets to all three days of the Electric Zoo 2023 festival.

15) Plaintiff Dakota Bedell is an individual who is a citizen of Wisconsin. Bedell purchased tickets to all three days of the Electric Zoo 2023 festival.

16) Plaintiff Carl Corbo is an individual who is a citizen of Connecticut. Corbo purchased tickets to all three days of the Electric Zoo 2023 festival.

17) Plaintiff Annabel Gould is an individual who is a citizen of New York County, New York. Gould purchased tickets to all three days of the Electric Zoo 2023 festival.

18) Plaintiff Dolores Thompson is an individual who is a citizen of Florida. Thompson purchased tickets to all three days of the Electric Zoo 2023 festival.

19) Plaintiff Bridgette Winkelmann is an individual who is a citizen of Wisconsin. Winkelmann purchased tickets to all three days of the Electric Zoo 2023 festival.

20) Plaintiff Billy Ting is an individual who is a citizen of Pennsylvania. Ting purchased one-day passes for Friday and Saturday of the Electric Zoo 2023 festival.

21) Plaintiff Duoc Vo is an individual who is a citizen of Virginia. Vo purchased tickets to all three days of the Electric Zoo 2023 festival.

22) Plaintiff Garry Huang is an individual who is a citizen of New York. Huang purchased tickets to Sunday of the Electric Zoo 2023 festival.

23)   Plaintiff Jeffrey Wang is an individual who is a citizen of New Jersey.  Wang purchased tickets to Saturday of the Electric Zoo 2023 festival.

24)   Plaintiff Joshua Chin is an individual who is a citizen of California.  Chin purchased tickets to all three days of the Electric Zoo 2023 festival.

25)   Plaintiff Willy Ngo is an individual who is a citizen of California.  Ngo purchased tickets to Friday and Saturday of the Electric Zoo 2023 festival.

26)   Defendant Avant Gardner, LLC (hereafter, "Avant Gardner") is a limited liability company organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

27)   Defendant EZ Festivals, LLC (hereafter, "EZ Festivals") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of New York.

28)   Defendant AGDP Holding Inc. ("AGDP") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in the State of New York, and is the sole member of EZ Festivals.

29)   Defendant Made Event, LLC (hereafter, "Made Event") is a limited liability company organized and existing under the laws of the State of Connecticut with its principal place of business in the State of New York.

30)   Defendant Jurgen Bildstein (hereafter, "Bildstein") is an individual residing and regularly doing business within the State of New York.

31)   Upon information and belief, Bildstein is the managing member with majority ownership interest of Avant Gardner, LLC, as well as the managing member of Made Event, LLC, and the President and Chief Operating Officer of both AGDP and EZ Festivals, as well as the manager of EZ Festivals; however, all Defendants are alter egos of one another.

## JURISDICTION & VENUE

32)   This Court has personal jurisdiction over all defendants, because all defendants domicile in, and/or regularly conduct business within, the State of New York, and the incident that gave rise to the complaint occurred within the State of New York.

33)   This Court has subject matter jurisdiction over the within controversy pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), as at least one Plaintiff and Defendant are citizens of different states, there are over 100 putative class members, and the total amount in controversy excluding interest, fees, and costs exceeds $5,000,000.

34)   Venue is proper because the incident that gave rise to the complaint occurred within the district boundaries for this Court.

## FACTUAL ALLEGATIONS

### *Part 1: Business Identities*

35)   Electric Zoo is a large music festival hosted annually in New York City during Labor Day weekend and has been ongoing for more than a decade, save for a pandemic-required break.

36)   Upon information and belief, Made Event is a business entity that created and has operated the Electric Zoo Festival.

37)   Upon information and belief, EZ Festivals acquired Made Event in 2022.

38)   Upon information and belief, AGDP acquired EZ Festivals in 2022, with Bildstein as President and Chief Executive Officer of both entities.

39) Following AGDP's acquisition of EZ Festivals in 2022, Bildstein was designated as the manager of EZ Festivals and took over operations of the Electric Zoo Festival.

40) Avant Gardner is a business entity that, *inter alia*, owns and operates music-related events and a large Brooklyn event venue known as "Brooklyn Mirage."

41) Bildstein used Avant Gardner's officers and directors to manage the Electric Zoo 2023 event, and operated AGDP, EZ Festivals out of its Brooklyn offices.

42) Avant Gardner used its resources to promote the Electric Zoo 2023 event.

43) Avant Gardner used its resources to staff the Electric Zoo 2023 event.

44) Avant Gardner used its resources to book talent for the Electric Zoo 2023 event.

45) EZ Festivals, AGDP, and Made Event are, therefore, simply alter egos of Avant Gardner.

46) Avant Gardner, AGDP, Made Event, EZ Festivals, and the Electric Zoo brand are all controlled by a single owner: Bildstein.

47) Upon information and belief, Bildstein *personally* directed and/or approved the overselling and other dangerous and fraudulent conduct herein complained of.


### *Part 2: The 2023 Festival*

48) The 2023 edition of Electric Zoo was advertised to be a 3-day event featuring a lineup of over 100 international and domestic "Electronic Dance Music" (EDM) artists, among others, held on Friday, September 1; Saturday, September 2; and Sunday, September 3, 2023.

49) Electric Zoo is the largest and most well-known annual EDM festival in New York City.

50) Defendants sold tens of thousands of tickets for all three days and festival-goers could buy tickets to any or all of the three event days.

51) Ticket prices ranged from approximately $150 for single-day passes to $265 or more for three-day passes.  VIP passes and "bottle service" experiences were available for hundreds or even thousands of dollars more.

52) Attendees were attracted by Defendants' advertisement and promotion of six new world-class stage buildouts, including the introduction of a "MegaMirage" stage, which Defendants touted as providing "larger-than-life experiences" with immersive production and audiovisual effects, laser light shows, pyrotechnics, and the integration of AI into the festival.

53) VIP attendees were promised, *inter alia*, (i) a premium entrance to the festival enabling patrons to skip the entry queue, (ii) premium viewing galleries of all six of the festival stages; (iii) access to VIP flush toilets in air-conditioned trailers; (iv) complimentary cell phone charging stations; (v) complimentary passed hors d'oeuvres; and (vi) an onsite host for VIP guests.

54) During the four days preceding the festival's start date, Defendants posted videos on their social media accounts with renderings of a number of the festival stages.

55) Prior to the scheduled day of the start of the festival, no social media or other communications expressed or implied any chance that there were issues or a possibility of cancellation.

56) To the contrary, on Thursday evening, August 31, 2023, at 10:17 PM (the night before the Friday event was scheduled to begin), Defendants posted on the festival's social media, "Get your rest. We'll see you tomorrow on the island."

57) However, the Friday event was cancelled without prior notice and did not happen in any shape or form.

58) Defendants announced at 11:37 AM on Friday, September 1, 2023, that they had "made the painful decision to cancel the first day of Electric Zoo."

59) This announcement came after many attendees had already taken off of work and out-of-state/area attendees had already begun their travels.

60) Defendants further explained on their social media that the reason for this cancellation was "global supply chain issues."

61) This statement was a lie, and known to Defendants to be a lie when it was made.

62) Upon information and belief, the actual reason for Friday's cancellation was that Defendants failed to build the stages at the Electric Zoo venue and other safety structures (platforms, access ways, *etc.*) required to operate the stages, and failed to obtain proper inspections, approvals, and/or permits in connection with the venue.

63) Upon information and belief, the primary cause of this failure is that Defendants refused to hire experienced union contractors who charged higher fees, and Defendants had gained a reputation for failure to timely pay its workers/contractors, and thus could not find sufficient qualified staff.

64) Upon information and belief, there were no "global supply chain issues" that required cancellation of the event. All other major Spring & Summer 2023 EDM festivals across the country (Electric Daisy Carnival, Dreamstate, Ultra Music Festival, *etc.*) took place without complaints of, let alone cancellations due to, such issues.

65) Further, Defendants delayed making their cancellation announcement until the day of the event, even though Defendants were well-aware that there was no chance of an on-time start long before Friday, September 1, 2023.

66) Upon information and belief, the purpose of the delay in the announcement was to allow Defendants to sell additional tickets, including tickets to "after party" events at the Brooklyn Mirage venue owned by Avant Gardner.

67) The artists scheduled to play on Friday were not rescheduled for another time, and consequently fans who purchased their Electric Zoo tickets for Friday hoping to catch "A-List" international EDM headliners such as Galantis, The Chainsmokers, Acraze, Excision, and Kaskade, all of whom were advertised to perform on Friday, ended up seeing none of those artists.

68) Later on Friday, however, Electric Zoo promised its attendees, via social media and electronic messaging to ticket-holders, that Saturday and Sunday would be starting on-time, as scheduled.

69) The Saturday event, however, scheduled for 1:00 PM to 11:00 PM, commenced approximately two hours late.

70) Ticketholders were given no advance notice of the delay, so many of them arrived for the 1:00 PM scheduled opening time only to find the gates closed.  They had no choice but to wait in the hot sun for hours.

71) Upon information and belief, on Saturday morning, Defendants were still awaiting final approval from local authorities for their construction and festival operations.

72) Further, even after the delayed opening of the gates, nearly all individuals faced *additional* substantial delays in entry.

73) For example, many individuals had to wait for several additional hours to reach ticketing staff to obtain wristbands required for entry.

74) While some attendees waited for hours, others were never able to enter the venue at all due to these extensive delays.

75) Upon information and belief, these additional delays were caused by Defendants' failure to adequately staff and train ticketing and security personnel, and due to overselling of the event.

- 12 -

76) Notwithstanding the delayed start and entry issues, Defendants did not extend the end-time for Saturday's musical acts; thus, although Saturday was scheduled to be a 10-hour event, attendees experienced at most 8 hours, while many were able to attend less than half of the event and some experienced none due to the long and slow-moving lines that kept them outside the gates.

77) Thus, on Saturday as well, many attendees were unable to see performances by the artists that had been advertised to them, either because the performances were cancelled or because the attendees were prevented from reaching the performance stages in time.

78) Moreover, even the few who did make it into the venue on Saturday on the earlier side were still prevented from attending any performances scheduled for the main stage because, as of the 3:00 PM delayed opening, the main stage was *still* not ready for use.

79) Additionally, when the main stage finally opened later on Saturday at approximately 5:00 PM, it fell well short of the experience Defendants advertised and was plagued by problems.

80) Instead of the elaborate set promised by Defendants, attendees found a bare-bones set up with little more than the actual stages, a few panels of lights, and only one of the promised three sets of overhead lighting displays, which were still in the process of being installed by workers on cranes after the area had opened for guests.

81) Additionally, the lighting and video monitors were either glitching or not working at all, and the sound system was cut off for several minutes during a main stage headliner's set.

82) Disruptions such as minutes of dead air during a headliner are not common at large music festivals.

83) Effects such as fog machines, pyrotechnics, and rockets were all but absent, contrary to the deluge of visual effects advertised.

84) Defendants' design of the festival grounds also inexplicably included several artificial bottlenecks that severely curtailed entrance to and egress from the main stage viewing area, thereby creating safety risks and impeding many from being able to enjoy the main stage performance or exiting the main stage area promptly when they desired to.

85) Further, the conditions within the festival grounds were unsanitary: guests encountered overflowing trash cans, insufficient bathroom facilities, inadequate supplies of toilet paper and water/hand sanitizer, shortages of drinking water, and general overcrowding, leading to excessively long lines for everything from port-a-potties to food vendors, and making it difficult to move from one area to another.

86) Additionally, wiring and cables for the musicians' equipment were exposed, rather than covered by rubber matting as is customary, creating tripping and even electrocution hazards in various locations.

87) The so-called "VIP areas" were not properly staffed and security guards solicited bribes to allow festivalgoers to enter those areas. Thus, guests who did purchase VIP tickets were forced to wait in long lines and endure overcrowding – precisely the circumstances they sought to avoid by paying extra for VIP access.

88) For those guests who sought to leave this fiasco, many encountered difficulties: some exits were or appeared to be closed, Defendants provided insufficient and untrained staff to facilitate exiting, and overcrowding prevented ready egress.

89) Sunday's event started on time.

90) Defendants, however, did nothing to alleviate the unsafe and unsanitary conditions that existed the prior day: cables remained exposed, garbage cans were overflowing, trash was strewn about the grounds, stages remained in rudimentary stages of construction, toilet facilities were overflowing and had not been replenished with hand sanitizer or toilet paper,

and, despite the 90-degree temperatures on the day, many water refilling stations were not functioning.

91) Beyond this, further issues arose when local law enforcement noticed that Electric Zoo had reached its lawful capacity only a few hours into the day. By approximately 6:00 PM, thousands of attendees on Randall's Island were still waiting for access, and more were on their way to the island.

92) As a result of the venue capacity having been reached, festival-goers were informed that no more attendees would be admitted.

93) Thus, people who had paid for tickets were denied entry into the event.

94) Upon information and belief, Defendants knowingly sold more tickets than the venue's legal capacity allowed.

95) Having spent considerable money and time to attend – with many guests traveling from across the country and some from out-of-country – festival-goers who were denied entry predictably "rushed the gate," pushing past and overwhelming the understaffed security and entering the event over their objections.

96) These individuals – unchecked for weapons or drugs, now in far greater numbers than legally allowed and with security unable to maintain control – created an unsafe environment where many incurred physical injuries[1].

97) Some security, overwhelmed by the crowd, abandoned their posts completely, whereas others began to engage in fistfights with attendees.

---

[1] This lawsuit does not seek recovery for damages for bodily injuries, and individuals who wish to recover for such damages may make separate claims and/or take separate legal actions.

98) Despite having lost control of the security of their operation, Defendants shockingly continued the Sunday festival to its conclusion, paying no mind to the substantial risk that doing so placed upon the attendees.

99) The maximum legal capacity of the event was 42,500 individuals.

100) Local law enforcement later estimated that at last 7,000 additional individuals were present, or approximately 17% above legal capacity.

101) Upon information and belief, the actual number of tickets sold substantially exceeds 49,500, as some individuals had not yet arrived by the time access to the event was "closed."

102) For those who made it in and were uninjured, the rest of the Sunday event was still marred by an incredible amount of overcrowding at each and every stage, as the number of attendees greatly surpassed the number of people each stage was capable of accommodating.

103) Upon information and belief, Bildstein had the final say over all operations of the Electric Zoo festival.

104) Upon information and belief, Bildstein personally directed or authorized more tickets to be sold than could be legally accommodated.

105) Upon information and belief, Bildstein personally directed or authorized the public announcements and responses of Electric Zoo, causing these announcements and responses to contain false information and material omissions, causing the Friday cancellation notice to be delayed until day-of-event, and causing the Saturday delay not being announced.

106) To date, no refunds or compensation has been provided to attendees whatsoever.

### *Part 3: History of Dangerous Operations*

107) Upon information and belief, Avant Gardner and Bildstein are a nuisance in New York City nightlife, who unlawfully overcrowd their venues, employ abusive security, fail to pay those

who work for them, run afoul of licensing and permitting requirements, and recklessly disregard the safety of their patrons.  In short, they are the worst-of-the-worst of bad actors in our local nightlife community.

108) Upon information and belief, since its inception in 2017, the Brooklyn Mirage venue has been cited by local officials and state regulators for extreme overcrowding and other serious safety hazards.

109) For example, in 2022, the venue settled an unprecedented 53 counts of charges by the New York State Liquor Authority ("SLA"), including multiple charges of employing unlicensed security guards, "sustained pattern of noise/disorder," refusing inspections, and even mislabeling goods for sale.  The settlement required Avant Gardner to hire an independent security monitor and pay a $100,000 fine.

110) The SLA is not the only regulatory agency to have shut down Brooklyn Mirage: NYC Department of Buildings, NYC Department of Health & Mental Hygiene, and the New York Fire Department have each, on separate occasions, shuttered the venue for unsafe conditions.

111) Despite paying hundreds of thousands of dollars in fines, Brooklyn Mirage has not improved: tragically, at least two people have died subsequent to attending their events in 2023 alone, and the year is not over yet.

112) This year, Avant Gardner has also been sued by the independent security monitor for failing to grant it access and failing to pay it.

113) This year, Avant Gardner has also been sued for sexual assaults committed by its security guards upon patrons.

114) In short, overcrowding its events, failing at security, and disregarding the safety of its customers is, in fact, Defendants' *modus operandi*, and they will continue to do so until forced to close or until the fines, judgments, and settlements outweigh their profits.

115) Avant Gardner's and Bildstein's history of dangerous operations demonstrate that the pervasive issues with the Electric Zoo festival were not due to accident, mistake, or inexperience, but due to Defendants' intentional practice of generating additional revenue and avoiding expenses by lying to their customers and failing to meet their contractual, statutory, and regulatory duties.

### *Part 4: Inter-Relationship Between Defendants*

116) Avant Gardner, AGDP, EZ Festivals and Made Event are not separate and independent organizations, but rather alter-egos of one another that worked together to promote, organize, and operate the Electric Zoo Festival 2023.

117) Thus, for example, *Avant Gardner* used its social media presence to advertise the Electric Zoo Festival as an *Avant Gardner* event.

118) Among other things, shortly after the musical lineup for the Electric Zoo Festival was announced, on or around June 7, 2023, Avant Gardner publicized that announcement via a post on its LinkedIn page, describing the lineup of performing artists as its own: "Ready to enter Electric Zoo: Hyperspace this September? *Our* full 2023 lineup just announced . . .".

119) Similarly, on August 28, 2023, both @avantgardnerbk and @brooklynmirage posted on Instagram "We've got your Labor Day weekend plans sorted across New York City" and listed all of their events from August 31 to September 4, 2023, including "9.1-3 (low tickets): @ElectricZooNY at Randall's Island Park."

120) Additionally, on September 1, 2023, both @avantgardnerbk and @brooklynmirage posted a promotion on Instagram listing their events for the month September 2023, and prominently featuring the Electric Zoo trademark logo followed by the text "SEPT 1/2/3 2023" and then "New York City" and "Randall's Island Park."

121) Through these social media posts and other public statements, Avant Gardener expressly affirmed its association with Electric Zoo Festival 2023 and promoted the event as its own.

122) Beyond the above, Avant Gardner further inextricably linked itself with the Electric Zoo Festival through the "MegaFox", an event promoted as a mini-festival within the Electric Zoo Festival, which contained its own separate stage, dubbed the "MegaMirage".

123) In an Instagram post dated June 15, 2023, @brooklynmirage and @avantgardnerbk described "MegaMirage" as coming "from the creators of the Brooklyn Mirage," and explicitly described "MegaMirage" as being a "brand-new & immersive stage concept that will take everything you love about The Brooklyn Mirage to the next level." The graphic that accompanied the posts promoting "MegaFox" also included Avant Gardner's trademarks including the "Brooklyn Mirage" and Avant Garnder's fox crest mark.

124) Additionally, on August 22, 2023, @brooklynmirage and @electriczoony again both posted about MegaFox, using Avant Gardner's trademarks, including the "Brooklyn Mirage" and Avant Garnder's fox crest mark.

125) In doing so, Avant Gardner publicly affirmed that MegaMirage and MegaFox – features of the Electric Zoo Festival – were organized by Avant Gardner.

126) In the same vein, Avant Garnder and the Electric Zoo Festival repeatedly intermingled their corporate identities and intellectual property in order to promote sales.

127) Thus, for example, on August 8, 2023, @electriczoony posted on Instagram a list of all of the "official afterparties" for the Electric Zoo Festival, including those taking place at the Brooklyn Mirage and the Great Hall at Avant Gardner. According to the post, tickets for those events were "available to purchase for all Electric Zoo pass holders" and the "only way to access the official afterparties is by having an Ezoo pass!"

128) Later, in an August 29, 2023 post, @brooklynmirage posted "This Saturday's MEGAFOX afterparty takes over The Brooklyn Mirage, The Kings Hall, & The Village for the biggest @ElectricZooNY afterparty of the weekend." The Brooklyn Mirage and the Kings Hall are both part of the same complex.

129) Similarly, and again erasing any formal distinction between the Electric Zoo Festival and Avant Garnder, on August 18, 2023, @avantgardnerbk posted via social media that that "@Griz continues the @ElectricZooNY party in The Great Hall with @Truthdubstep, @Super_Ave & @i.am.SAVAS on September 1," .

130) These examples, among many others, demonstrate that Avant Gardner not only directly profited from the Electric Zoo Festival, it participated in organizing Festival events and programs, co-mingled its identity and intellectual property with that of EZ Festivals and Made Event, and subsumed itself into a collective comprising all of the Defendants without regard for corporate formality.

131) Equally important, Avant Gardner used its own resources and staff to promote, organize, and operate the Electric Zoo Festival.

132) Among other things, Avant Gardner officers and staff were directly involved in hiring and communicating with vendors for the Electric Zoo Festival and utilized their Avant Gardner systems and emails to engage with such vendors.

133) By virtue of this fact, various vendors and workers who have yet to be paid for their services in connection with the Electric Zoo Festival have commenced multiple separate actions in which Avant Gardner is named as the principal defendant.

134) Beyond the above, Avant Gardner also exploited the branding of EZ Festivals and Made Event to promote, organize, and operate Avant Gardner's Electric Zoo afterparties.

135) Avant Gardner's pervasive involvement in the Electric Zoo Festival was ultimately directed by Jurgen Bildstein, who personally participated in all of the material decision-making at the company and touted its promotion of the Electric Zoo Festival.

136) In a September 8, 2022 article, Bildstein was quoted saying "We've set a goal of bringing an improved experience for EZoo fans during this transitional year by introducing all-new stages, innovative production, and creating a more immersive feel to the festival. I believe we've done the best we could in the short time that we had – now, with a full year of preparations, we are going to take the next step and welcome New Yorkers and guests from all over the world into a new era of festival experiences!" Notably, Avant Gardner's LinkedIn account re-posted that article, with an additional comment describing Bildstein as "the new owner of Electric Zoo.".

137) In the days leading up to the event, Bildstein personally visited and inspected the construction site for the Electric Zoo Festival stages on Randall's Island, and, on multiple separate occasions, publicly posted pictures of and comments concerning the setup and construction still taking place on his own social media feed.

138) Likewise, when, on September 1, 2023, the first day of the Electric Zoo Festival was cancelled at the last minute, Bildstein personally noted that fact on his own social media page.

139) These posts demonstrate Bildstein's personal involvement in and supervision over the construction of the stages in the days leading up to Electric Zoo 2023 as well as over the Festival's subsequent operation.

140) Indeed, based on documents filed by Defendants in these very proceedings, Bildstein was the sole manager of EZ Festivals.

141) Accordingly, and not surprisingly, after the conclusion of the Festival, NYPD Chief of Patrol, John Chell, identified Bildstein as personally responsible for its operation.

## *Part 5: Plaintiffs' Experiences*

### *Plaintiff Alexandra Avchukov*

142) In June 2023, Avchukov was living in Atlanta, Georgia and purchased a 3-day ticket to Electric Zoo 2023 for $264.99.

143) Avchukov's purchase was made after reviewing the artist lineup published by Defendants and noticing several artists whom she wanted to see.

144) Avchukov boarded a plane on the morning of the Friday event from Atlanta to New York.

145) Only upon landing, Avchukov found Defendants' announcement that Friday was cancelled.

146) Avchukov had taken off from work in order to attend Friday, and would not have but for Defendants' assurances.

147) Avchukov intended to see a favorite artist, "GRiZ," perform on Friday, but due to the cancellation, GRiZ never performed.

148) Avchukov returned on Saturday at about 5 PM, after Defendants announced a delay of the scheduled 1 PM festival start time, but she encountered many issues with the festival.

149) For example, Avchukov was unable to access the main stage grounds anywhere but through the very back, with limited view, because of dangerous overcrowding and only two small ingress/egress options apparent despite 10,000 or more persons being present there.

150) As another example, using the bathroom required wait times of half an hour, in addition to substantial time spent pushing through crowds to find those bathrooms.

151) Avchukov attempted to leave the festival, but found that the marked exit was a narrow dirt road so crowded that it was difficult to breathe.

152) Traversing this narrow dirt road to leave the festival took *three hours*, even though the total distance was less than a mile.

153) Avchukov's Sunday experience was similar, except that facilities on that day were only filthier and crowds even more dense, and Avchukov again could not meaningfully access the main stage area.

154) Prior to departing, Avchukov spent time studying maps of the island on her phone in an attempt to avoid the crushing departure of the previous day, and she ultimately ventured through an unmarked egress requiring additional miles of walking, but which allowed her to breathe and exit in about an hour and a half.

155) Avchukov received no compensation from Defendants for any of the festival's significant shortcomings, including the fully cancelled day.

*Plaintiffs Quentin Chappat & Sandra Maesta Pereira*

156) Chappat and Maesta Pereira are a married couple.

157) In November 2023, Chappat and Maesta Pereira were living in New York, New York when Chappat and Pereira purchased two 3-day tickets to Electric Zoo 2023 at $269.99 each.

158) These tickets were purchased as part of a "Black Friday" sale, as a result of reviewing marketing of the event and being given the impression that these would be the lowest prices at which tickets would be available.

159) Nevertheless, Defendants dropped prices a few months after the Black Friday sale.

160) Notwithstanding having paid premium prices for "sale" tickets, Chappat and Maesta were excited to see the advertised lineup promised by Defendants and were thoroughly disappointed when, on Friday, they read the announcement that all the events of that day were cancelled.

161) On Saturday, Chappat and Maesta were among the "lucky" ones: they "only" had an hour wait to enter the festival.

162) The reason Chappat and Maesta were "lucky" was that the security team at the entrance used by Chappat and Maesta Pereira had given up on checking identification or conducting any meaningful security search, creating a dangerous and likely unlawful environment.

163) Once inside, Chappat and Maesta immediately noticed how full the festival was.

164) Chappat and Maesta Pereira felt extremely unsafe as a result of the extreme overcrowding combined with obviously insufficient security.

165) Chappat and Maesta attempted to enter the main stage area, but were unable to enter because the crowd was so dense.

166) Chappat and Maesta encountered bathrooms that were disgusting, long queues at all facilities, and dense crowds at all points.

167) Chappat and Maesta were also among the lucky ones while leaving Saturday with "only" a one hour journey out of the gates using a path less than one mile long.

168) Sunday they were less lucky: their MTA bus to the island took 2.5 hours because vehicles were unable to move on the overcrowded streets around the festival. Once off the bus, it took them an additional 1.5 hours to get in, throughout which they were stuck in the hot sun; no water was provided (or allowed) to those waiting in line.

169) Security again appeared to skip most of the security search.

170) Upon entrance, all of the stages and the pathways between them were already overcrowded. The main stage was particularly dangerous because there were no discernable exits for over 10,000 people save for two small doors. Chappat and Maesta were again unable to access the main stage area.

171) Shortly after their arrival, Chappat and Maesta Pereira observed attendees – whom they later learned were not allowed in due to overcrowding – rushing the gates and overwhelming security; Chappat and Maesta were terrified.

172) After a few short hours, Chappat and Maesta attempted to leave the island.

173) Leaving the island took approximately two hours.

174) Thus, despite living in Manhattan and the festival taking place in Manhattan, it took approximately *six hours* of their day to arrive and depart the festival.

175) Chappat and Maesta received no compensation from Defendants for any of the festival's significant shortcomings, including the fully cancelled day.

*Plaintiff Kris Iyer*

176) In Summer 2023, Kris Iver was living in New York, New York, and purchased tickets for Friday and Saturday of the 2023 Electric Zoo festival for approximately $234.

177) Iyer purchased his tickets after reviewing the artist lineup published by Defendants.

178) Iyer had left work early on Friday, only to notice while leaving his job that Defendants had cancelled all the Friday events.

179) On Saturday morning, Iyer also took notice of Defendants' announcement of a delayed start.

180) Arriving Saturday afternoon, entry to the festival entailed a wait on-line of approximately two hours.

181) Thus, although Iyer purchased two days of festival, for a total of 18 hours of scheduled entertainment, Iyer missed out on a full 8-hour day on Friday, plus two hours due to the delayed start on Saturday, plus another two hours dut to the delayed entry on Saturday – or exactly two-thirds of the promised festival time – because of Defendants' inability to timely commence and allow access to the festival they promised him.

182) Once inside, despite the event being hot and sunny and Defendants having promised to provide food and beverage (and, indeed, Defendants prohibited attendees from bringing their own food and beverage), Iyer noticed Defendants were "sold out" of basics like electrolyte drinks ("Gatorade"), they had minimal water refill points, and those who were lucky enough to stay hydrated set themselves up for lengthy waits for unsanitary toilets.

183) Iyer was able to access the main stage grounds, but also noticed that exiting the main stage area was limited by "choke points" where 10,000+ people were required to squeeze through.

184) Choke points for crowds create extremely dangerous conditions: other festivals have had attendee *deaths* as a result of trampling in such chokepoints, and no reasonable festival organizer would implement such dangers.

185) Leaving the island on Saturday took two hours, despite the exit path being less than one mile long.

186) Iyer received no compensation from Defendants for any of the festival's significant shortcomings, including the fully cancelled day.

*Plaintiff Anthony Palie*

187) Plaintiff Anthony Palie, who at all relevant times lived in Boston, Massachusetts, is a former event promoter who is very familiar with the world of electronic dance music and has attended a number of electronic dance music events during the last several years. He has consistently looked for new and interesting musical performances to attend and eagerly anticipated attending the Electric Zoo festival in 2023, which he had never previously attended.

188) In early August 2023, after reviewing promotional materials posted by Defendants concerning the festival, Palie purchased a three-day ticket package to the festival, costing

approximately $385.   In the following lead-up to the festival, Palie closely followed Defendants' promotions through social media, with increasing excitement, reading and sharing among his friends Defendants' posts about the festival acts and immersive stages.

189)  In order to attend the festival, on the night of Thursday, August 31, Palie drove with a group of three friends from Boston to New York City, where the entire group rented a hotel for their stay.   That night, Palie read Defendants' post from 10:17 PM, advising attendees to "Get your rest. We'll see you tomorrow on the island," with enthusiasm, and he and his group eagerly proceeded to make preparations for the following day.   These preparations included arriving at the festival grounds early so that one member of their group could obtain their ticket to the festival from the will-call line.

190)  Much to Palie's and his friends' disbelief, however, as he was preparing to attend the opening day of the festival the next morning, he received the Defendants' cancellation notice.   Given Defendants' prior representations concerning the festival, which included promotion of Defendants' readiness for the event and no indication of possible issues, Palie initially believed that the notice of cancellation was a hoax.   Soon, however, his disbelief gave way to frustrated resignation, as he realized that a full third of the festival would not proceed as advertised.   The cancellation also prevented Palie's friend from picking up a will-call ticket that day.   Even so, and despite his disappointment, Palie was encouraged by Defendants' representation that the festival would still go on, as scheduled, on Saturday and Sunday.

191)  This initial optimism was soon dashed, however, when, the following morning, Saturday September 2, Palie and his friends learned through Defendants' social media postings, that the festival opening would be delayed by an additional two hours. Palie subsequently made arrangements for his group of friends and him to arrive at Randall's Island at approximately 3:30 PM.

192) The scenes of overcrowding and disorganization that greeted Palie and his friends at the entrance to the festival were shocking and unprecedented in all his prior experience attending music events. Staff lacked basic knowledge about the festival and were unable or unwilling to direct or assist attendees attempting to enter. Due to the confusion, Palie was obliged to part ways with his friend who stood in a will-call line – ultimately for approximately 4.5 hours – to obtain a wristband (necessary to enter the festival and purchase any items from vendors). Palie was himself forced to wait more than an hour in a line just to enter the festival grounds. During this period, he and other attendees were stranded in the heat with no access to water.

193) Thereafter, upon entering the festival, Palie was confronted with even greater hazards. He observed exposed cables strewn about the festival grounds, creating tripping hazards; shoddily constructed viewing platforms erected by Defendants, leaving gaps in the floorboards in which footwear would get caught or lodged; and improperly placed barricades set up by Defendants to direct and contain crowds, which created tripping hazards to unsuspected pedestrians.

194) Upon information and belief, Defendants failed to supply sufficient trash receptacles to attendees.

195) Palie estimated that he saw a total of only ten trash cans throughout the whole of the festival grounds – causing litter to accumulate throughout the grounds.

196) Additionally, signage at the festival was lacking or confusing, and when Palie and his friends attempted to seek assistance from festival staff, they were consistently greeted either with apathy and ignorance or outright belligerence.

197) Beyond the physical hazards and confusion created by Defendants that Palie experienced, he was dismayed to find that, in sharp contrast to the elaborate and immersive stages set forth

in Defendants' advertisements, the stages were bare and only partially completed.  Among other things, many of the stages lacked lighting and had display screens that were either wholly or substantially inoperative.  Separately, none of the additional experiences or shops (other than food vendors) that had been promoted by Defendants were present at the festival.

198) Palie and his friends decided to leave the festival on Saturday prior to the conclusion of the final musical sets.  As Palie departed the festival grounds, he observed staff inexplicably closing the gates and barring attendees behind them from leaving.  As a result, through social media, Palie learned that thousands of attendees were trapped for hours on Randall's Island on Saturday night and into Sunday morning after the conclusion of Saturday's musical acts.

199) The following day, Sunday, September 3, Palie arrived for the last day of the festival at approximately 2:30 PM.  Upon entry to the festival grounds, Palie was shocked to observe that Defendants had done little to nothing to improve the conditions over the prior day.  Cables remained exposed, garbage cans were overflowing, trash was strewn about the grounds, and the stages remained in rudimentary stages of construction.  Additionally, festival staff were, if anything, more aggressive and hostile toward attendees than the previous day.

200) Given the general state of neglect and disorganization at the festival, Palie was overcome by anxiety as the crowds at the festival began to grow.  Accordingly, at approximately 5:30 PM, he felt compelled to leave the festival and return to his hotel.

201) Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Palie for the festival tickets he purchased and associated fees.

*Plaintiffs Dakota Bedell & Bridgette Winkelmann*

202) Plaintiffs Dakota Bedell and Bridgette Winkelmann, who at all relevant times lived in Eau Claire, Wisconsin, have attended many music festivals and, as early as June 2023, began planning to attend Electric Zoo in New York with a group of friends.

203) In July 2023, Bedell and Winkelmann bought three-day tickets to the festival, each package costing approximately $350. Both also bought tickets to an after-party featuring Liquid Stranger on Saturday, September 2, which was promoted by Defendants to festival attendees and hosted at a venue owned by Defendant Avant Gardner. The after-party tickets cost $80 each.

204) In order to attend the festival, Bedell and Winkelmann temporarily closed the business they own together, and, with a group of four additional friends, drove over 1,100 miles from Eau Claire to New York City, where the entire group rented an apartment for their stay.

205) The group arrived in New York City on Thursday, August 31, the day before the festival. Seeing Defendants' post from 10:17 p.m. encouraging attendees to rest up for Friday, they eagerly prepared for the following day, planning to arrive at the festival grounds early so that one member of their group could obtain their ticket to the festival from the will-call line.

206) Much to Bedell's and Winkelmann's consternation and dismay, however, the next morning, just as they were preparing to leave their rental apartment to travel to the festival, they learned that Defendants had cancelled the entire first day of the festival. The cancellation prevented their friend from picking up a will-call ticket that day. Even so, and despite their disappointment, Bedell and Winkelman were encouraged by Defendants' representation that the festival would still go on, as scheduled, on Saturday and Sunday.

207) This initial optimism was soon dashed, however, when, the following morning, Saturday, September 2, Bedell, Winkelmann, and their group of friends learned about the two-hour delay in the festival's opening through Defendants' social media postings.

208) Bedell and Winkelmann subsequently made arrangements with their group to arrive at Randall's Island at approximately 4:00 PM.

209) The scenes of overcrowding and disorganization that greeted Bedell and Winkelmann at the entrance to the festival were shocking and unprecedented in all of their prior experience attending music events.  Staff lacked basic knowledge about the festival and were unable or unwilling to direct or assist attendees attempting to enter.   Due to the confusion, Bedell and Winkelmann were obliged to part ways with their friend who stood in a will-call line – ultimately for approximately six hours – to obtain a ticket.   Bedell and Winkelmann themselves were forced to wait for approximately two-and-a-half hours in a line just to enter the festival grounds.

210) Thereafter, upon entering the festival, Bedell and Winkelmann found that many of the stages were not fully constructed and that many of the screens were not operational.   Furthermore, when they attempted to use the restroom facilities indicated on the festival maps that Defendants had provided, they found that one of the sites consisted of only a single port-a-potty that was chained closed.  At a separate site, they found limited port-a-potties that were overcrowded and lacked basic sanitation, including hand sanitizer or washing stations. Additionally, when they attempted to seek assistance from festival staff, they were consistently greeted either with apathy and ignorance or outright hostility.

211) Worse yet, when the last music acts completed their sets on Saturday, festival staff failed to instruct, direct, or enable the assembled crowds on how to exit the festival grounds.  As a result, Bedell and Winkelmann were caught in a crush of humanity as attendees chaotically

attempted to leave Randall's Island.  During that time, they witnessed attendees lose consciousness or scream out for medical assistance, which was never provided.  Bedell and Winkelmann were trapped for over three hours before they were ultimately able to extricate themselves from the festival grounds.

212) As a result of the delay, Bedell and Winkelmann missed almost all of the Liquid Stranger after-party hosted by Defendant Avant Gardner, for which they had pre-purchased tickets.

213) Due to their harrowing experiences on Saturday, Bedell and Winkelmann resolved to travel earlier to the festival on Sunday, the last day, to avoid the initial crowds.  Even so, at the start of their day they waited over two hours to enter the festival.  Limiting their use of the unsanitary bathrooms, which had only become filthier since the prior day, Bedell and Winkelmann attempted to enjoy the musical acts of the final day of the festival; however, by 6:00 PM, they realized that, due to Defendants' lack of planning and overselling of tickets, the festival grounds became so overcrowded that they could no longer freely travel between the various stages at the festival to see their acts of choice.  With each passing hour thereafter, movement became increasingly obstructed and conditions at the festival increasingly hazardous.

214) Accordingly, at approximately 9:45 PM, over one hour before the conclusion of the festival, Bedell and Winkelmann decided to leave for good.  Despite their efforts to leave, however, they again found themselves trapped.  Their final experience at the festival consisted of desperately trying to maintain their footing amid a restive mass of humanity struggling to leave the festival grounds, without aid or instruction from festival staff.  It would take them over three hours before they were able to extricate themselves from Randall's Island.

215) Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their

acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Bedell or Winkelmann for the festival or after-party tickets they purchased and associated fees.

*Plaintiff Carl Corbo*

216) Plaintiff Carl Corbo, who at all relevant times lived in Torrington, Connecticut, has worked in the promotion and booking industry and is very familiar with the world of electronic dance music.  While Corbo has attended many electronic music shows in the past, he had never before attended the Electric Zoo festival.

217) In early June 2023, after reviewing promotional materials posted by Defendants concerning the festival, Corbo purchased a three-day ticket package to the festival.  The ticket package cost Corbo approximately $300.  In the subsequent months leading up to the festival, Corbo closely followed Defendants' promotions through social media with increasing excitement.

218) In order to attend all three days of the festival, Corbo took off work on Friday, September 1, 2023, to travel from Connecticut to New York City, and he booked a hotel room from Friday through Sunday.  Much to his shock and frustration, however, Corbo learned on Friday, while on a train to New York, about the cancelation of the entire first day of the festival.  Had he known about the cancelation earlier in the day, he could have canceled his hotel room for Friday night.

219) When Corbo arrived at the entrance to the festival on Saturday afternoon – having seen the 11:37 AM post regarding the delayed opening and adjusting his plans accordingly – the scenes of overcrowding and disorganization that greeted him there were shocking and unprecedented in his prior experience attending music events.  Staff lacked basic knowledge about the festival and were unable or unwilling to direct or assist attendees attempting to

enter.   Due to the confusion, Corbo was forced to wait more than an hour in a line just to enter the festival grounds.  During this period, he and other attendees were stranded in the heat with no access to water.

220) To his further concern and dismay, upon entering the festival grounds, Corbo found dangerous, unsanitary, and disorganized conditions, including exposed cables strewn about the festival grounds that created tripping hazards for attendees, trash accumulated on the grounds, poor or confusing signage, sparse and unsanitary bathroom facilities, inadequate water replenishing stations, and apathetic, combative, or dishonest festival staff, including security staff accepting bribes from attendees to bypass lines and to access restricted areas at the festival.

221) Corbo was also flabbergasted by Defendants' striking failures to fulfill the basic promises set forth in their promotional materials.  In sharp contrast to the elaborate and immersive stages set forth in Defendants' advertisements, the stages Defendants in fact erected at the festival were bare and only partially completed, falling far short of the renderings advertised by Defendants: lifts and cranes were actively working on stages while artists performed, and stages lacked lighting and had display screens that were either wholly or substantially inoperative.

222) Given both his extreme dissatisfaction and his safety concerns with respect to the conditions he observed on Saturday, Corbo left the festival early that day in the hopes that Defendants would complete their construction and provide a presentable and safe experience the following day.  In fact, however, conditions on Sunday were even worse.

223) Upon entry to the festival grounds on Sunday, Corbo was shocked to find that Defendants had done nothing to improve the conditions over the prior day.  Cables remained exposed, garbage cans were overflowing, trash was strewn about the grounds, stages remained in

rudimentary stages of construction, toilet facilities were overflowing and had not been replenished with hand sanitizer or toilet paper, and many water refilling stations were not functioning, leaving him with no option other than purchasing bottled water from vendors. Corbo observed multiple people collapse at the festival on Sunday, apparently due to heat and dehydration.

224) Worse yet, due to Defendants' lack of planning and overselling of tickets, as evening on Sunday fell, the festival grounds became dangerously overcrowded, causing Corbo to fear for his life. By evening, space was so limited that Corbo was trapped in the tight crowds that Defendants had admitted but had failed to organize or control. His final experience at the festival consisted of a terrifying and hours-long effort to maintain his footing to avoid being trampled, which has left him with lingering anxiety and sleeplessness, weeks after the festival. That experience extended hours after the last acts of the festival concluded.

225) After the festival concluded, it took Corbo approximately three hours to leave Randall's Island, as he and tens of thousands of others struggled to navigate their way out of the festival without aid or instruction from festival staff. Moreover, while Corbo had purchased a shuttle pass from the festival from Defendants, he was forced to forego use of that service after Defendants made the shuttle available to all attendees at the festival without increasing their capacity to shuttle all attendees.

226) Upon information and belief, Defendants had hired only four school buses for the shuttle service.

227) As a result, after waiting in line for a shuttle for approximately two hours, Corbo relented and navigated the crowds to depart Randall's Island by foot, which took approximately one hour. He then hired an Uber to take him back to his hotel.

228) Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Corbo for the festival tickets and the shuttle passes he purchased, and any associated fees.

### *Plaintiff Annabel Gould*

229) Plaintiff Annabel Gould, who at all relevant times lived New York City, New York, is a college student who is very familiar with the world of electronic dance music and previously attended an Electric Zoo music festival at Randall's Island in 2021.

230) On or around May 26, 2023, after reviewing promotional materials posted by Defendants concerning the festival, Gould purchased a three-day ticket package to the festival, costing approximately $230.

231) In the intervening months, Gould followed, with increasing excitement, Defendants' promotion of the festival through social media, including their final post the night before the first day of the festival, advising attendees to "Get your rest" in anticipation of Friday's opening day. Gould was therefore shocked and disappointed to learn the following morning, just hours before the opening acts were scheduled to perform, that Defendants had cancelled the entire first day of the festival.

232) When Gould arrived at Randall's Island on Saturday afternoon, she was astonished by the marked differences she observed at the festival compared to her prior experience attending the 2021 Electric Zoo music festival. Staff lacked basic knowledge about the festival and were unable or unwilling to direct or assist attendees attempting to enter; signage was lacking or confusing; and crowds were significantly larger. As a result, large bottlenecks formed

throughout the festival, including hour-long delays entering the festival after its gates opened and departing the festival after the last musical acts concluded.  Additionally, in contrast to her experience in 2021, the festival lacked adequate bathroom facilities and water replenishing stations.

233)  Most striking of all, however, was the yawning gap between the immersive sound and stage experiences that Defendants had advertised compared to what they provided in fact.  Among other things, the main stage of the festival was initially closed as the festival opened on Saturday, and even thereafter, all of the festival stages fell far short of the renderings advertised by Defendants: lifts and cranes were actively working on stages while artists performed, and stages lacked lighting and had display screens that were either wholly or substantially inoperative and glitchy.

234)  Finally, after the musical acts on Saturday concluded, Gould was trapped for hours in a crush of humanity as attendees chaotically attempted to leave the festival grounds and Randall's Island without the aid or assistance of festival staff.   Fearing for her safety, all Gould could do was try to maintain her balance and avoid being trampled as the confused crowds struggled to leave.

235)  The following day, Sunday, September 3, Gould decided to attend the festival commencing later in the day.  She began her trip to Randall's Island from the Upper East Side at approximately 6:00 PM.  Enroute to the festival, however, she learned – via a social media message posted by Defendants at 6:35 PM – that Defendants would cease admitting additional attendees to the festival because it had reached capacity.  Defendants cited "the challenges caused by Friday [sic] cancellation" as an explanation for this fact.  Accordingly, Gould was left with no choice but to go back home.

236) Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their constructive cancellation of Sunday's acts, their failure to deliver the services they promised, and the chaos and panic created by their acts and omissions on Saturday, Defendants have failed to provide any refund or recompense to Gould for the tickets she purchased and any related fees.

*Plaintiff Dolores Thompson*

237) Plaintiff Dolores Thompson, who at all relevant times lived in Kissimmee, Florida, is a health care worker who has attended a number of music festivals, including, on occasion, purchasing "VIP" packages that offer access to additional or expanded amenities.   She has consistently looked for new and interesting music events to attend and eagerly looked forward to attending the Electric Zoo festival in 2023, which she had not previously attended.

238) Several months before the festival, after reviewing promotional materials posted by Defendants, Thompson purchased a three-day VIP ticket package to the festival, as well as a shuttle pass service from Brooklyn to Randall's Island offered by Defendants.  In all, the ticket package and shuttle pass cost Thompson approximately $780.

239) Among the amenities Defendants advertised as included with the VIP ticket package that Thompson purchased were: (i) premium entrance to the festival skipping the entry queue, (ii) premium viewing galleries of all six of the festival stages; (iii) access to VIP flush toilets; (iv) complimentary cell phone charging stations, (v) complimentary hors d'oeuvres, and (vi) an onsite host for VIP guests.  As described in the paragraph below, Defendants not only failed to provide the advertised VIP amenities, their actions and omissions also caused Thompson to miss a significant number of festival acts and created noxious and/or hazardous conditions that made it impossible to reasonably enjoy the remainder of the acts.

240) In order to attend every day of the festival, Thompson flew from Florida to New York City and booked a hotel room from Thursday, August 31, through the entire Labor Day weekend. Much to her shock and frustration, however, Thompson discovered on the following day, September 1, that Defendants had cancelled the entire first day of the festival.

241) Thompson learned about Defendants' 11:37 a.m. post on Saturday morning, less than two hours before Saturday's scheduled opening, in time to delay her travel to the festival.

242) Thompson travelled to the festival that afternoon, but upon arriving at Randall's Island, and despite being promised a designated VIP check-in with expedited entry to the festival grounds, she was directed to wait in line for multiple hours before being admitted to the festival. To her shock and dismay, upon entering the festival grounds, Thompson found dangerous and disorganized conditions, including exposed cables strewn about the festival grounds that created tripping hazards for attendees, trash accumulated on the grounds, unsanitary port-a-potties without toilet paper or hand-sanitizer, poor or confusing signage, and untrained staff.

243) Beyond the dangerous and disorganized conditions created by Defendants at the festival, there were also other striking failures to fulfill the basic promises set forth in Defendants' promotional materials. In sharp contrast to the elaborate and immersive stages set forth in Defendants' advertisements, the stages Defendants in fact erected at the festival were bare and only partially completed. Initially, the main stage of the festival was closed as construction continued on it, but even thereafter, all of the festival stages fell far short of the renderings advertised by Defendants: lifts and cranes were actively working on stages while artists performed, and stages lacked lighting and had display screens that were either wholly or substantially inoperative.

244) Defendants also failed to fulfill their promises with respect to the VIP amenities they had advertised and sold to Thompson.

    (a)   First, as noted above, Defendants failed to provide a VIP check-in on Saturday.

    (b)   Second, while Defendants promised premium views of all of the festival stages to VIP guests, multiple stages lacked any VIP viewing areas.

    (c)   Third, while Defendants promoted flush toilets to VIP guests, in fact, toilets were available at only one stage and fell woefully short of the necessary capacity required for the number of attendees.

    (d)   Fourth, while Defendants had promised complimentary electronic charging stations to VIPs, they failed to provide these, except to patrons who paid an additional fee to obtain lockers at other specified stations.

    (e)   Fifth, while Defendants had promised complimentary hors d'oeuvres to VIP guests, no complimentary food of any kind was provided, and VIP guests were instead directed to paid food vendors.

    (f)   Finally, while Defendants had promised an on-site VIP host, they failed to provide any concierge services.  Instead, the VIP areas were manned by security staff whom Thompson observed taking bribes and admitting general admission guests.  This, of course, served only to overcrowd the VIP areas and to defeat the purpose of the special amenities for which Thompson had paid.

245) Thompson's last day at the festival, Sunday, September 3, was the culmination of the miseries she had experienced over the prior two days.  Upon entry to the festival grounds on Sunday, Thompson was shocked to observe that Defendants had done little to nothing to improve the conditions over the prior day.  Cables remained exposed, garbage cans were overflowing, trash was strewn about the grounds, stages remained in rudimentary stages of

construction, port-a-potties had not been cleaned or replenished with hand sanitizer or toilet paper, and water refilling stations began to malfunction.

246) Thompson observed multiple people collapse at the festival on Sunday, and even provided aid to one attendee who apparently had become dehydrated. Moreover, due to the intolerable conditions, and despite having no prior history of anxiety, Thompson suffered an anxiety attack and was forced to make her way in the overcrowded grounds to the VIP rest area near the main stage.

247) Worse yet, due to Defendants' lack of planning and overselling of tickets, as evening on Sunday fell, the festival grounds became extremely overcrowded, such that Thompson was no longer able to freely traverse among the various stages at the festival to see her acts of choice. Soon, movement became wholly obstructed and festival attendees jostled for space and balance, creating dangerous and chaotic conditions.

248) Thompson's last experience of the festival consisted of desperately trying to manage her anxiety amid restive crowds of attendees struggling to leave the festival grounds without aid or instruction from festival staff. Moreover, while Thompson had purchased a three-day shuttle pass from the festival from Defendants, Defendants ultimately – and without prior notice – chose to make the shuttle service available to all attendees at the festival without increasing the number of shuttle buses accordingly. Consequently, as the festival concluded on Sunday, instead of benefiting from this additional perk that she paid extra for, Thompson was forced to wait for hours with thousands of other attendees attempting to utilize it. Due to the extended delay, Thompson finally chose to forego the service altogether and hired an Uber to travel to an (oversold) afterparty in Brooklyn for which she had previously purchased tickets from Defendants.

249) Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Thompson for the festival tickets, VIP benefits, after-party tickets she purchased, and any related fees.

*Plaintiff Billy Ting*

250) Plaintiff Billy Ting is a resident of Philadelphia, Pennsylvania.

251) About a month before Electric Zoo 2023, Ting saw the set lists released by Defendants.

252) After reviewing the set list, Ting decided to purchase tickets to Electric Zoo 2023 for Friday access.

253) Among the artists he was most excited to see perform were Griz, Kaskade, Madeon, Said the Sky, Blanke, Adventure Club, Excision, and Galantis.

254) On Friday, September 1, 2023, Ting took a half day off of work to attend Electric Zoo 2023.

255) After his shift ended, he boarded a train to New York City.

256) It was only while already on the train when Ting saw that the Friday event day was cancelled.

257) Ting was extremely disappointed, but was already in transit to New York and had arranged for accommodations.

258) Defendants represented that Electric Zoo 2023 was still going to proceed on Saturday as planned, and there were a number of artists scheduled to perform on Saturday whom Ting was a fan of.

259) Therefore, Ting then made a last-minute purchase of a one-day ticket for Saturday, as Ting tried to make the best out of the situation.

260) On Saturday, September 2, 2023, Ting arrived at the venue around 3:00 PM, right when the doors were re-scheduled (after the festival announced a delayed opening) to open, since Ting did not want to miss a single minute of the festival.

261) Ting got on the Will Call line to pick up his wristband required for entry into the venue, and then waited. And waited. And waited. Ting waited *over five hours* that day on a line that moved at a glacial pace.

262) By 8:00 PM, Ting *had still not yet received his wristband*.

263) The sun had already set, and Ting had not eaten for hours, and was still *nowhere near the front of the line*.

264) Saturday was scheduled to end at 11:00 PM, and most of the artists Ting wanted to listen to had already finished their performances.

265) On top of that, the situation on the Will Call line had become increasingly tense. To Ting's knowledge, Defendants made no announcement of the availability of wristbands on Friday, which would have allowed Ting and other ticket holders to pick up their wristbands early, alleviating the situation.

266) Defendants staffed very few employees at the Will Call booth to process wristband distribution.

267) As the hours ticked by, it became increasingly clear that those on the Will Call line will be missing most, *if not the entirety*, of their Saturday festival access.

268) The staff who were working on managing the Will Call line were unable to answer any questions, never offered the people on line any water or beverages while they waited, and were utterly indifferent to the frustration and anger of the tense crowd.

269) As the sun set, the crowd became increasingly angry about the situation which made Ting deeply nervous and uncomfortable.

270) Finally, after 8:00 PM, out of hunger, frustration, anger, and a little bit of fear, Ting decided to leave the queue and go home.

271) Abandoning the festival turned out to be a wise move: a friend of Ting's, who had been waiting on the line with Ting, reported back to him that he did not receive his wristband until *10:30 PM,* just 30 minutes before the close of the event.

272) As a result, Ting incurred damages in the amounts of his payments of not only the Friday and Saturday passes, neither of which as of the date of this Complaint have been refunded, but also the train fares to come to New York City, as well as the paid time off used to attend the festival that, for him, never happened.

*Plaintiff Dewey Vo*

273) Plaintiff Duoc "Dewey" Vo is a resident of Richmond, Virginia.

274) Vo purchased a ticket for the full three-day Electric Zoo festival.

275) Vo took time off from work starting from the Thursday before Electric Zoo.

276) On Thursday, Vo boarded a train to New York City and checked into his accommodations for the weekend.

277) On Friday, September 1, 2023, as Vo was getting ready to attend the event, he received the notification that Friday had been canceled.

278) This news was especially devastating because many of Vo's favorite artists (Kx5, Galantis, The Chain Smokers, Acraze, Excision, Adventure Club, Ghengar, Chris Lake x Fisher, Mau P, HoneyLuv, Kaskade, Madeon, and Said the Sky) were all slated to perform on Friday.

279) While Vo was still interested in seeing the other artists, the Friday lineup was the main driver for Vo's purchase of his Electric Zoo 2023 ticket.

280) It was specifically in anticipation of the excellent Friday lineup that Vo took days off from work and made sure to arrive in New York City on Thursday so that he would not miss any performance scheduled for Friday.

281) On Saturday, Vo received the notification that Electric Zoo was postponed by 2 hours.

282) Not wanting to miss any time at all, Vo arrived at Electric Zoo early at or around 2:30 PM to be one of the first ones in the venue.

283) Once he arrived, Vo headed straight for the Main Stage.

284) Despite Defendants' representations, the stage was not yet completed and Vo saw that workers were still working on setting up the Main Stage.

285) Vo returned at around 4:30 PM, at which point the main stage was still not ready and no artists were performing.

286) It was not until 5:00 PM, *4 hours after when the Main Stage was initially supposed to be ready*, and 2 hours after Defendants said it was going to be ready, did Matroda start performing. Even then, the setup of the Main Stage remained ongoing.

287) Vo stayed for Matroda and then Gryffin, and while in the middle of Gryffin, just as the music was building to a crescendo, the audio cut off completely for several minutes, destroying the atmosphere the artists had been creating.

288) After Gryffin, Vo wanted to leave to use the restroom before attending Nghtmre, who was performing at a different stage.

289) To Vo's horror, it had become impossible to leave.

290) The Defendants had constructed a series of bottlenecks which created an artificial funnel, leading to a human traffic tunnel that made it next to impossible for people to enter or leave the Main Stage.

291) Vo found himself and his group trapped and unable to budge.

292) His group eventually spotted an "exit sign" and headed there, but once there, they were barred by security from exiting on the ground that the exit sign leads to a VIP section.

293) Altogether, it took nearly an hour to get out of the main stage, causing Vo to miss a large chunk of Nghtmre's performance.

294) For the rest of the evening, Vo and his group were so deeply traumatized by the experience that when they returned to the main stage, they felt comfortable only staying towards the very back of the stage where the crowding was less intense.

295) Unfortunately, they were not able to get nearly the level of immersive experience expected from the back of the stage as the audio-visual equipment was not set up correctly.

296) On Sunday, Vo and his group arrived at the venue at around 3:00 PM.

297) Outside the entrance, there was a large mass of people crowded with no semblance of lines or order, in the hot scorching sunlight without shade or water, with the temperature reaching a high of 84 degrees Fahrenheit.

298) Defendants did not permit anyone to bring outside beverages, including water, to the venue, and there were no water refill stations outside the entrance.

299) Consequently, Vo and his group were forced to stand in the relentless heat without succor or relief for over an hour.

300) When they were finally let in the venue, things were going fine only at the beginning.

301) The venue soon became increasingly overcrowded, with massive numbers of people packed at every stage.

302) The hot press of the crowds combined with the temperature of the day made every stage uncomfortably hot.

303) As the night went on, Vo became increasingly uncomfortable with the overcrowding, but having paid so much for his ticket, he and his group stayed until the close.

304) At the end, while there were splashes of transcendental moments at the festival, the entire experience was a massive letdown and a bitter disappointment.

### *Plaintiff Garry Huang*

305) Plaintiff Garry Huang is a resident of Queens, New York.

306) Huang had never been to Electric Zoo before and was excited for his first experience.

307) Huang purchased the Sunday only Electric Zoo passes for himself and his fiancée.

308) On Sunday, Huang arrived at Electric Zoo with his fiancée.

309) They parked their car in the Bronx and walked for about an hour to get to Randall's Island, arriving and getting in line before 6:00 PM.

310) There they waited in the hot afternoon sun for hours as the line slowly inched forward.

311) But at some point, the line stopped moving.

312) Huang checked his phone and saw Defendants' social media posts about the festival being oversold, but the post specifically stated that it did not apply to people who were already on the island and already in line, and so Huang and his fiancée continued to wait.

313) Shortly thereafter, someone shouted that the security was about to stop letting any more people in, and a tense atmosphere immediately settled on the crowd.

314) Suddenly, there was a surge of people rushing to get in.

315) Huang felt himself being pushed from behind, making him worry about the safety of himself and his fiancée.

316) Together Huang and his fiancée moved along with the crowd in an effort to avoid being trampled over.

317) Once they were pushed to the front of the line, they noticed that there was no staff attending the gates, and no one there to provide any sort of support or crowd control.

318) As the crowd pushed Huang and his fiancée forward, Huang continued to do his best to protect himself and his fiancée from being hurt, but when the surge pushed them to the gate, Huang's foot got caught in some wires.

319) Thereafter, one of the metal detectors that was at the entrance fell, hitting both Huang and his fiancée, and momentarily trapping Huang's leg.

320) It was a deeply frightening moment for them both, but fortunately Huang was able to get his leg out, and together Huang and his fiancée were finally able to limp to the side in order to allow the crowd to pass.

321) After checking for injuries, they both determined that they could still walk, but were in no condition to walk back to their car parked in the Bronx.

322) Together Huang and his fiancée limped into the festival, tired, wary, frightened and in pain, and looked for a place to simply sit and rest.

323) By then it was already dark, most of the festival had already passed, and almost all the major artists had concluded their sets.

324) Huang and his fiancée sat for a while, heard perhaps two sets from afar, and waited for their injuries to recover, before making it out of the venue.

325) During their brief stay there, they stayed well to the back of the venue to avoid the crowds, traumatized by their earlier experience, and worried about the intense crowding that took place. Needless to say, they derived little enjoyment from the experience.


*Plaintiff Jeff Wang*

326) Plaintiff Jeffrey Wang is a resident of Paramus, New Jersey.

327) A few weeks before Electric Zoo, Wang saw the artist set lists released by Defendants.

328) After reviewing the set list, Wang decided to purchase tickets to Electric Zoo for Saturday access, as the artists he was most excited to see perform (Zedd, Alison Wonderland, Gryffin, Nghtmre, and Camelphat) were scheduled to perform on Saturday.

329) On Saturday, Wang arrived at Randall's Island around 4:00 PM, shortly after the event was scheduled to start, and at which point he got on the Will Call line to pick up his wristband.

330) Wang waited for *four hours* on that line.

331) As he waited, he could hear hints of music in the background in the air, but even after the sky had darkened, Wang was still far from the front of the line.

332) The line moved at a glacial pace, and as the day passed, people became more and more agitated about the situation.

333) Finally, at or around 8:00 PM, hungry, tired, and frustrated, Wang left the line once it became clear that he was never actually going to get in the venue.

334) A friend who was with Wang and waited with him that day later told Wang that he did not get into the venue until 10:00 PM, just *one hour* before the festival ended at 11:00 PM.

335) Wang never received his wristband from the Will Call line that day, despite having waited for many hours in the relentless sunlight, and therefore never allowed to see a single artist for which he paid the price of admission to see.

*Plaintiff Josh Chin*

336) Plaintiff Joshua Michael Chin is a resident of Los Angeles, California.

337) Chin purchased a three-day pass to Electric Zoo 2023.

338) In order not to miss a single moment of the festival, he flew in to New York City on Thursday before the first day of the festival.

339) It was while getting ready for the festival when he learned that the Friday event was cancelled, which was a big disappointment for Chin.

340) On Saturday, Chin arrived at Randall's Island at or around 4:30 PM. There, he encountered long and slow-moving lines and spent roughly 2 hours waiting before he was finally let in at or around 6:30 PM.

341) Once inside, Chin proceeded to the Main Stage, which he noticed was still not completed even as of 6:30 PM. Many of the screens which were supposed to be displaying the performances were instead completely blank.

342) During Gryffin's performance on the main stage, the audio was cut off for approximately five minutes, completely disrupting the atmosphere and ruining the entire set.

343) The most horrifying aspect for Chin was trying to leave the Main Stage after the end of Gryffin's performance.

344) Defendants had installed artificial chokepoints, which created a flood of people pushing and shoving one another.

345) Chin realized that he could not find a way to get out of the Main Stage and found himself trapped.

346) It took Chin an hour to exit the Main Stage.

347) For the rest of the evening, Chin found himself avoiding the Main Stage or at least avoiding moving towards the front of the Main Stage because of the experience.

348) The next day Chin arrived at Randall's Island at or around 4:30 PM.

349) There, he waited for over two and a half hours in the blistering sunlight without succor.

350) Chin did not observe any of the organizers distributing water or setting up shade to help alleviate the hot sweltering temperatures as people waited on the slow lines to get inside.

351) Just before 7:30PM, as Chin was nearing the front, the line stopped moving completely.

352) At some point, someone in the line shouted that the security was not letting people in.

353) This flatly contradicted Defendants' earlier post, which stated only people not already on the Island were not going to be allowed in.

354) All of a sudden there was a surge of people from all direction pushing to make it into the venue.

355) Chin found himself swept up in the crowd with no option but to move along, lest being trampled on by the crowd.

356) Eventually the surge of crowd pushed Chin into the venue, at which point there was not a single member of security present to monitor the crowd, or offer assistance or even any directions or instructions.

357) By then, it was already late in the evening and the festival was almost over.

358) For the next hour or two, Chin stayed at the venue, catching only two sets before heading home.

359) Every stage Chin tried to visit was intensely overcrowded, with little opportunity to make his way towards the front or any section where he could immerse himself in the music.

360) On top of that, Chin was exhausted from the long, hot, sweltering wait, and the brush with being nearly trampled on.

*Plaintiff Willy Ngo*

361) Plaintiff Willy Ngo is a resident of San Francisco, California.

362) Ngo purchased a Friday-Saturday pass to Electric Zoo 2023. This was Ngo's first Electric Zoo experience.

363) As a passionate raver, Ngo, like many others, flew in earlier in the week in order to attend each and every day of the festival.

364) Ngo was especially excited about Friday because some of their favorite artists, including Said the Sky and Madeon, were scheduled to perform on Friday.

365) For this reason, Ngo was in shock when they heard that Friday's event was cancelled, not believing it at first, thinking it was some sort of mistake or prank.

366) Ngo's group of friends then began inquiring whether they could pick up their Will Call tickets on Friday since they were already in New York City, having arrived early. Their inquiries to Electric Zoo organizers all went unanswered.

367) On Saturday morning, Ngo and their group left for Randall's Island, making efforts to get there extra early even though they had learned that the event start time was postponed.

368) Despite getting there early, Ngo saw a massive line on the Will Call line. While waiting on the line, it appeared to Ngo that no more than five people were getting their wristbands every half hour.

369) It was not until after 6:00 PM when Ngo finally received their wristband and was allowed to enter the venue.

370) By the time Ngo entered the venue, many of their favorite artists scheduled to perform that day had already played their sets, and Ngo had already missed them.

371) By the time Ngo made it to the main stage, they barely caught the last few minutes of Timmy Trumpet.

372) Ngo noticed right away that the sound quality was much poorer than expected.

373) On top of that, Ngo noticed that there were no visuals. All the major EDM artists create visual displays that are intended to accompany their music and usually plays on the audio-visual equipment simultaneous with the music.

374) However, the audio-visual equipment that day only showed the artists themselves, occasionally breaking down to show just a green screen, and had a few color filters that came on periodically. There were no artist-generated visual accompanying displays.

375) This glaring lack of accompanying visuals was especially apparent when the next artist, Gryffin, started to perform. All that was on display during Gryffin's performance was images of the artist himself with, again, some bland color filters.

376) While Gryffin was playing, Ngo noticed that the sound quality was poor, and they could barely hear the bass. There was also distortion or static, as if the equipment was set up in a rush without adequate testing beforehand.

377) Once Gryffin's performance ended, Ngo and everyone there that night was treated to an unusually prolonged intermission before Alison Wonderland's set. During this long intermission, no music was played at all, and no visuals were on display to entertain the crowd.

378) On top of the poor quality of the audio-visual equipment, Ngo and their group experienced harassment by Defendants' security guards.

379) For example, a security guard was barging through the crowd and stepped on the leg of one of Ngo's friends. When Ngo raised the issue of the guard's reckless conduct, the security guard told Ngo to "fuck off" and continued stomping his way through the crowd.

380) All in all, Ngo's first Electric Zoo experience was a bitter disappointment, and a massive let down, especially in consideration of the distances traveled for Ngo to be there.


### *Part 6: Class Allegations*

381) Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (3), as applicable, and (c)(4).

382) Plaintiff seeks certification of a single class: all who purchased a ticket to attend the 2023 edition of the Electric Zoo festival, including those who bought tickets indirectly.

383) This class excludes all who did not purchase a ticket, including those working for Defendant, as well as those who resold their ticket to a third-party and professional resellers (those who purchased a ticket with intent to resell rather than attend) who may have unsold inventory, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants, and the judges and court personnel in this case and any members of their immediate families.

384) All Plaintiffs in this action had tickets to at least one of the three days of the event, they each attempted to access at least one of the three days of the event, and they each were subject to the misrepresentations, cancellations, and unsafe conditions described *supra*.

385) Upon information and belief, there are up to 50,000 tickets sold for each of the three days of the festival; because of overlap (people who purchased tickets for more than one day), the number of class members is expected to be between 50,000 and three times that number (150,000).

386) This putative class meets the requirements of Fed. R. Civ. P. 23(a) (b)(3) because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable. This action satisfies the predominance, typicality, numerosity, superiority, and adequacy requirements of these provisions.

387) *Numerosity* – The size of the class is expected to be over 50,000 persons, making it impracticable to individually name all possible plaintiffs.

388) *Commonality* – Common legal questions would predominate individual actions, including but not limited to:

> i.     Whether Defendants made false representations about the Electric Zoo festival, including misrepresenting the musical acts that would perform at the Electric Zoo festival, and concealed, suppressed and omitted material facts, such as the festival's inadequate infrastructure and staffing, and the lack of preparedness to accommodate persons at the Electric Zoo festival, and whether Defendants created an unsafe environment for attendees, including by overselling the event;

> ii.     If so, whether Defendants knew or should have known that their representations were false or were reckless as to their veracity at the time they were made, and whether Defendants' omissions were material;

> iii.     Whether Defendants negligently misrepresented various facts regarding the Electric Zoo festival;

> iv.     Whether Defendants breached any implied or explicit contractual obligations to ticket buyers and to attendees of Electric Zoo festival;

> v.     Whether Defendants violated various consumer protection statutes;

> vi.     Whether Defendants created an unsafe environment at the Electric Zoo festival; and

> vii.     Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and class members are entitled to damages, restitution and/or other remedies to which class members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

389) *Typicality* – All class members were induced to pay for an experience that was not delivered as advertised, regardless of which day or days for which they had purchased tickets, and were similarly injured by Defendants in the amount of their ticket fee.

390) *Adequacy* – Plaintiffs have no interest separate from, or in conflict with, those of the proposed class they seek to represent, and will fairly and zealously seek recovery for the entire class.

391) *Superiority* – A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and substantially more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

392) The Court should also consider the public interest in holding Defendants accountable using class proceedings, which are more likely than individual proceedings to deter future repeat conduct that threatens the public welfare.

## CLAIMS FOR RELIEF

### *Count 1 – Deceptive Acts and Practices (N.Y. GBL § 349)*

#### *Against All Defendants*

393) Defendants engaged in deceptive practices with respect to the entire class that occurred in and emanated from New York, where Defendants and their founders have been headquartered, conducted business, and had extensive ties at all relevant times.

394) These practices were aimed at individual consumers, and Plaintiffs and class members are individuals who paid for Defendants' services for personal purposes.

395) Defendants sold tickets to class members with an implied promise that they would entitle the class members to access to a safe festival environment.

396) Defendants had no intent on creating a safe environment, and instead knew that they would attempt to oversell the event, unlawfully, as much as they thought they could get away with.

397) Defendants sold tickets to class members with an express promise that they would entitle class members to see performances by specific musical acts.

398) Defendants sold tickets to class members by advertising world-class stages featuring immersive sound, lighting, and special effects.

399) Defendants sold tickets to class members by advertising amenities for all attendees, such as reasonable bathroom facilities, as well as VIP amenities.

400) Defendants, however, intentionally failed to take the steps required to deliver those musical acts, world-class stages, and amenities.

401) Defendants' deceptive acts were material because they related to facts that a reasonable consumer would consider when deciding whether or not to purchase services from Defendants.

402) Plaintiffs and class members were deceived by Defendants' practices, as a reasonable person would have been deceived by the same.

403) Plaintiffs and class members were injured by Defendants' practices because they were unable to enjoy the benefits promised by Defendants when they purchased their tickets, as well as due to wasted time and money in preparing for and traveling to the festival each day, and sustained injury that they would not have but for Defendants' lies.

404) Defendants committed these acts willfully and knowingly.

405) Defendants Avant Gardner, Made Event, EZ Festivals, and Bildstein are thus liable to Plaintiffs for deceptive acts and practices in violation of N.Y. GBL § 349.

## *Count 2 – Breach of Contract*

### *Against All Defendants*

406) In exchange for consideration provided by Plaintiffs and class members (the ticket fee), EZ Festivals and the other Defendants as EZ Festivals' alter egos were contractually bound[2] to provide a safe entertainment experience, at the advertised world-class festival level advertised, for full three days.

407) Defendants, in fact, did not provide a single full day of safe, let alone world-class or remotely comparable, festival on any of the three days of Electric Zoo in 2023. Thirty-six percent of the festival (by hours advertised) did not happen *at all*, dozens of promised musical performances never occurred, and the portion of the festival that did happen was so marred by delays, danger, and deception, as well as inadequate facilities and staffing that would be customary and necessary to accommodate festival attendees, such that Defendants have not even partially performed in any way meaningful to those on the other side of the contract.

408) Further, Plaintiffs and class members who purchased "VIP" amenities had a contract to receive those amenities, but Defendants did not perform their duties under this part of the contract either.

409) Each of these failures constituted a material breach of Defendants' duties under the contract.

---

[2] The contract between the parties was implicitly created by the offering, followed by purchase, of a ticket. There is thus no signed writing to attach to the Complaint.

410) Each of Plaintiffs and class members had fully performed their duties under the contract by paying the ticket fee and appearing at the festival at the designated time; there are no unsatisfied conditions precedent to Defendants' performance.

411) Neither Defendants nor any party acting on their behalf have remunerated Plaintiffs in any way.

412) Plaintiffs and class members were damaged by Defendants' practices because they were unable to enjoy the benefits of the contract agreed to by Defendants when they purchased their tickets.

413) Plaintiffs and class members are thus entitled to damages for breach of contract against all Defendants.

### *Count 3 – Unjust Enrichment*

#### *Against All Defendants*

414) In the alternative to a breach of contract, EZ Festivals and the other Defendants as EZ Festivals' alter egos were paid consideration by Plaintiffs for services that were not rendered, and was thus enriched at that amount.

415) It would be inequitable, unconscionable, and unjust to allow Defendants to retain *any* compensation for their deceptive, misleading, and unlawful conduct complained of herein, wherein Plaintiffs and class members were subjected to an unlawfully overcrowded and excessively delayed disaster of a festival with incomplete and defective venue setups.

416) Defendants were thus unjustly enriched, and Plaintiffs seek restitution for all profits, benefits, and other compensation obtained through their wrongful conduct.

417) Upon information and belief, Bildstein personally profited from the ticket sales for this festival, and having orchestrated the wrongful conduct of the other Defendants, should also

not be allowed to retain any profits, benefits, and other compensation obtained through his wrongful conduct.

### *Count 4 – False Advertising (N.Y. GBL § 350)*

#### *Against All Defendants*

418) Defendants published and disseminated to Plaintiffs and class members with marketing and advertising materials stating that Electric Zoo 2023 was a three-day, 28-hour event.

419) Defendants published and disseminated set lists to Plaintiffs and class members, describing a list of popular DJs and artists scheduled to perform on each of these three days during the festival.

420) Defendants described the sizes of the stages and the grandeur of the audio and visual effects of festival in the marketing and advertising materials published and disseminated to the Plaintiffs and class members.

421) Defendants further led Plaintiffs and class members to believe that they would be permitted to enter the venue at a reasonable time after arrival, that the venues would be completed with the stages and equipment set up and in working order, and that the number of people attending would be reasonably within the venue's capacity, so as to prevent overcrowding and to ensure a safe and pleasant experience.

422) At no time prior to the festival did Defendants disclose to any of Plaintiffs or class members that Defendants sold tickets without regards to the capacity of the festival venue whatsoever.

423) At no time prior to the festival did Defendants disclose to any of Plaintiffs or class members that the stages were substantially smaller than advertised and that the audio and visual equipment would not be present in working order so as to provide the proper effects as advertised.

424) At no time prior to the festival did Defendants disclose to any of Plaintiffs or class members that services and facilities would be drastically reduced, to the point of preventing a fully functional festival from taking place.

425) Defendants materially failed to deliver on what was advertised and marketed to Plaintiffs and class members.

426) Defendants' advertising and marketing materials were misleading in various material respects as described above.

427) Defendants are thus liable to Plaintiffs and class members for false advertising pursuant to N.Y. Gen. Bus. Law § 350-e(3).

### *Count 5 – Fraud*

*Against All Defendants*

428) Defendants represented, among other things, that: (1) musical acts, such as, without limitation, Deadmau5, Zedd, Gryffin, Marshmello, Kaskade, and Griz, among others, would be performing as advertised from 3:00 PM to 11:00 PM on Friday, September 1, 2023, and from 1:00 PM to 11:00 PM on Saturday and Sunday September 2-3, 2023; (2) immersive, ground-breaking multi-media stages, featuring elaborate sets, lighting, pyrotechnics, and other effects would be provided at Electric Zoo 2023; (3) a range of vendors and artists would be present at Electric Zoo 2023; (4) facilities for safety and hygiene would be made available to all attendees at Electric Zoo 2023; (5) a safe environment with sufficient security would be afforded to all attendees at Electric Zoo 2023; and (6) crowds would be maintained at or within legal capacity of the venue.

429) These representations were materially false and/or contained material omissions.

430) Plaintiffs and class members relied upon these representations, and their reliance was reasonable.

431) Defendants are thus liable to Plaintiffs for fraud.


### Count 6 – Negligent Misrepresentation

#### Against All Defendants

432) Defendants represented, among other things, that: (1) musical acts, such as, without limitation, Deadmau5, Zedd, Gryffin, Marshmello, Kaskade, and Griz, among others, would be performing as advertised from 3:00 PM to 11:00 PM on Friday, September 1, 2023, and from 1:00 PM to 11:00 PM on Saturday and Sunday September 2-3, 2023; (2) immersive, ground-breaking multi-media stages, featuring elaborate sets, lighting, pyrotechnics, and other effects would be provided at Electric Zoo 2023; (3) a range of vendors and artists would be present at Electric Zoo 2023; (4) facilities for safety and hygiene would be made available to all attendees at Electric Zoo 2023; and (5) a safe environment with sufficient security would be afforded to all attendees at Electric Zoo 2023; and (6) crowds would be maintained at or within legal capacity of the venue.

433) These representations were materially false and/or contained material omissions.

434) Defendants were negligent in making the representations because they should have known the representations were false. Defendants should have known that they could not and would not provide the goods and services that they had represented to Plaintiffs and class members.

435) As the event planners, Defendants were uniquely and solely positioned to provide accurate information concerning the musical acts, the schedule, the facilities, and conditions that would be provided to attendees at the Electric Zoo festival, and Plaintiffs and class members were entirely reliant on Defendants for this information.

436) Defendants intended for the representations to induce Plaintiffs and class members to act on these representations and to, among other things, purchase tickets and to arrange their plans to attend the Electric Zoo festival.

437) Plaintiffs and class members relied upon Defendants' misrepresentations and omissions, and their reliance was reasonable.

438) Plaintiffs and class members were known parties to Defendants as they purchased their wristbands from Defendants, publicly followed Defendants' social media pages, signed up with Defendants for text updates, or signed up with Defendants to otherwise be notified as to any and all updates concerning the festival.

439) The nature of Defendants' misrepresentations and omissions evince a high degree of moral turpitude and a wanton dishonesty and indifference to their obligations.

440) Defendants are thus liable to Plaintiffs for negligent misrepresentation.

### *<u>Count 7 – Breach of Implied Covenant of Good Faith and Fair Dealing</u>*

*<u>Against All Defendants</u>*

441) Defendants' acts and omissions, by failing to provide access to the festival's first day; delaying the opening by two hours on the second day; barring ticket holders from entering the third day of the festival; creating noxious and unsafe conditions throughout the festival; failing to provide adequate staffing, sufficiently accessible sanitary facilities, cancelling specified musical acts, failing to provide reasonable access to means to effect a timely departure; and failing to provide the promised amenities to Plaintiffs and class members, who paid for them, interfered with the rights of Plaintiffs and class members to receive the benefits of the bargain and constituted a breach of its duty of good faith with Plaintiffs and class members.

442) Plaintiffs and class members expended money to purchase their tickets and other items associated with the Electric Zoo festival.

443) As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs and class members were damaged

444) Defendants are thus liable to Plaintiffs and class members for their breach of the implied covenant of good faith and fair dealing.

### *Count 8 – Promissory Estoppel*

### *Against All Defendants*

445) Defendants made representations to Plaintiffs and class members that the festival was going to be a three-day event with such representations being made, and reinforced, up to and until Friday, September 1, 2023.

446) Defendants' representations were clear and unambiguous, with Defendants releasing a set list showing all the artists who were scheduled to perform on Friday, September 1, 2023.

447) Plaintiffs and class members, in reliance on Defendant's representations, purchased tickets to Electric Zoo 2023, took days off from work, made arrangements with respect to transportation and accommodations, and dedicated their time for a holiday weekend.

448) The start date of the event was reasonably within Defendants' control and had Defendants properly invested in the event, the event would have proceeded on time and on schedule.

449) Based upon the forgoing, Defendants are liable to Plaintiffs and class members under a theory of promissory estoppel.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

i.   An order certifying the class pursuant to Fed. R. Civ. P. 23, naming Plaintiffs as representatives of the class and the undersigned counsel as Class Counsel to represent the class.

ii.  Actual damages in the amount of the face value of each ticket purchased by each class member, jointly and severally against every Defendant found liable under GBL § 349, breach of contract, fraud, and negligence (estimated at approx. $12,000,000, to be confirmed via discovery),

iii. Punitive, statutory, and/or compensatory damages, jointly and severally against all defendants found liable for the following counts, in the following amounts:

    a.   Three times the actual damages for each class member, not to exceed $1,000 per class member, pursuant to N.Y. GBL § 349(h), (estimated at approximately $35,000,000, to be confirmed via discovery).

    b.   As the jury may allow for fraud and negligent misrepresentation.

    c.   In the amount of $500 per plaintiff pursuant to N.Y. GBL § 350.

iv.  Restitution and any other appropriate equitable relief,

v.   Pre- and post-judgment interest as allowed by law,

vi.  Attorney's fees for this action, as explicitly provided by N.Y. GBL § 349(h), N.Y. GBL §350-e(3), or otherwise,

vii. Cost of the action, and

viii. Any other such relief as the Court deems appropriate.

Dated: New York, NY

April 4, 2024

Respectfully submitted,

**CORBETT RIGHTS, P.C.**

By:_____*/s/Jonathan Corbett*_____

Jonathan Corbett, Esq..
*Attorneys for Plaintiffs Alexandra Avchukov,*
*Quentin Chappat, Sandra Maesta Pereira,*
*Kris Iyer, on behalf of themselves and all*
*others similarly situated*
CA Bar #325608 (*pro hac vice granted*)
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
E-mail: jon@corbettrights.com
Phone: (310) 684-3870
FAX:  (310) 675-7080

**DGW KRAMER, LLP**

By: _____*/s/Jacob Chen*_____

Jacob Chen, Esq.
Rita Y. Wang, Esq.
*Attorneys for Plaintiffs Billy Ting, Duoc Vo,*
*Garry Huang, Jeffrey Wang, Joshua Chin,*
*and Willy Ngo, on behalf of themselves and*
*all others similarly situated*
One Rockefeller Plaza; Ste. 1060
New York, NY 10020
Tel: (917) 633-6860
Fax: (917) 633-6183
Email: jchen@dgwllp.com
      rita@dgwllp.com

**TRIEF & OLK**

By:  __*/s/ Shelly L. Friedland*_____

Shelly L. Friedland
Eyal Dror
*Attorneys for Plaintiffs Anthony Palie,*
*Dakota Bedell, Carl Corbo, Annabel Gould,*
*Dolores Thompson, and Bridgette*
*Winkelmann, on behalf of themselves and all*
*others similarly situated*
750 Third Avenue, Suite 2902
New York, NY 10017
Tel: (212) 486-6060

sfriedland@triefandolk.com
edror@triefandolk.com